Bolen Webb and Cornelia Webb v. Commissioner.
Webb v. Commissioner
Docket No. 1530-63.
United States Tax Court
T.C. Memo 1966-81; 1966 Tax Ct. Memo LEXIS 199; 25 T.C.M. (CCH) 454; T.C.M. (RIA) 66081; April 20, 1966
*199 During the taxable years 1958 through 1960, petitioner, Bolen Webb, operated three retail liquor stores, and in July 1960, he began operating a fourth store. Petitioner's books and records for said business were inaccurate and inadequate. Webb had no way from any books and records kept by him to ascertain how much each store was earning or losing during the taxable years involved herein. On his income tax returns for the years in question, petitioner understated both the total receipts from and the cost of sales for his retail liquor business by approximately 50 percent. Respondent, by use of the percentage markup method, determined that petitioner received substantial amounts of additional income in each of the years 1958 to 1960, inclusive. Respondent also determined that petitioner is liable for additions to tax for fraud under section 6653(b), I.R.C. 1954. Held: (1) Respondent was justified in reconstructing petitioners' income for the years in question by applying a percentage markup of gross profit on sales. (2) Petitioner understated his net taxable income for the years in question in the amounts determined by respondent. (3) The underpayments *200 resulting therefrom for such years were due in part to fraud with intent to evade tax within the purview of section 6653(b), I.R.C. 1954. Jack Gray Johnson and Robert L. Blumenthal, 1700 Mercantile Bank Bldg., Dallas, Tex., for the petitioners. James F. Hart, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined deficiencies in income tax and additions to tax for fraud under section 6653(b), Internal Revenue Code of 1954, as *201 follows: Additions to Tax
Year
Deficiency
Section 6653(b)
1958
$ 9,413.74
$4,706.87
1959
10,101.14
5,050.57
1960
10,561.46
5,280.73
The principal issues presented for our consideration are: (1) Whether respondent was justified in reconstructing petitioners' taxable income for the taxable years 1958 through 1960, by the percentage markup method applied to cost of goods sold; (2) whether and to what extent petitioners understated their net taxable income for the years in question; and (3) whether any part of the deficiency determined for each of the years involved is due to fraud with intent to evade tax within the purview of section 6653(b) of the 1954 Code. Adjustments for 1958 and 1959, with reference to sales of rental properties, have been settled by stipulation of the parties. Findings of Fact Part of the facts are stipulated and are found accordingly. Petitioners Bolen and Cornelia Webb are husband and wife residing in Dallas, Dallas County, Texas. Petitioners filed joint returns for the taxable years 1958, 1959, and 1960 with the district director of internal revenue, Dallas, Texas. Cornelia Webb is a petitioner herein only because *202 she filed joint returns for the aforesaid years, and hereinafter Bolen Webb will be sometimes called Webb or petitioner. Except for inventories, petitioner utilized the cash receipts and expenditures method of accounting on a calendar year basis. Webb has been engaged in the retail liquor business in Dallas, Texas, since 1946. He opened his first liquor store in 1946 at 2117 Leonard Street and constructed the building himself. In 1948 Webb ceased operating the store at 2117 Leonard Street and opened a new store at 2101 Leonard because it was a better location. He constructed the building himself at 2101 Leonard and operated a liquor store from 1948 through 1960. This store will sometimes hereinafter be called Store #1. Webb opened a second store at 4315 South Oakland in Dallas, Texas, in 1952 (sometimes hereinafter called Store #2), and opened a third store in 1955 at 3220 Oakland Street (sometimes hereinafter called Store #3). Petitioner constructed the building at 3220 Oakland Street himself. The petitioner ceased operating the store at 4315 South Oakland Street at the end of 1957 and opened another store at the beginning of 1958 at 2000 Second Avenue, Dallas, Texas. This *203 store which operated in 1958, 1959, and 1960 will be sometimes hereinafter also referred to as Store #2. During the years 1956 and 1957, the petitioner operated three retail liquor stores at 2101 Leonard, 4315 South Oakland, and 3220 Oakland Street. During the years 1958, 1959, and 1960, the petitioner operated three stores at 2101 Leonard Street, 3220 Oakland Street, and 2000 Second Avenue, and in July of 1960 he began operating a fourth store located at 2621 South Ervay Street, Dallas, Texas (sometimes hereinafter referred to as Store #4). J. T. Lightner managed the store located at 4315 South Oakland from 1955 until the store closed in 1957, and after that date he managed the store at 2000 Second Avenue from the first part of 1958 through the year 1960. Jewel Jackson managed the store at 2101 Leonard Street from 1955 through 1963. J. D. Cooper managed the store located at 2621 South Ervay Street from the time it opened in June of 1960 through the remainder of the year. From 1949 until 1955, petitioner operated the liquor store at 2101 Leonard Street full time, six days per week between the hours of 9:00 a.m. and 10:00 p.m. Since 1955 petitioner has continuously operated *204 the store at 3220 Oakland full time during the same hours as above, only occasionally relieving employees at his other liquor stores for several hours. Respondent conducted an examination of petitioners' income tax returns for the years 1956 and 1957. These two returns were investigated by a revenue agent between August 1958 and June 1959. The petitioners' 1956 and 1957 returns reported the following amounts from their liquor store operations: 1956
1957
Sales
Store #1
$38,910.00
$39,101.90
Store #2
24,203.00
12,800.00
Store #3
13,600.00
13,800.00
Computed Total Sales
$76,713.00
$65,701.90
Cost of Sales
Store #1
$28,890.00
$29,009.70
Store #2
19,360.00
8,600.00
Store #3
9,200.00
9,340.00
Computed Total Cost of Sales
57,450.00
46,949.70
Gross Profit
Store #1
$10,020.00
$10,092.20
Store #2
4,843.00
4,200.00
Store #3
4,400.00
4,460.00
Computed Total Gross Profit
19,263.00
18,752.20
Expenses
Store #1
$ 9,543.17
$ 9,467.00
Store #2
5,685.00
4,247.00
Store #3
4,518.80
4,498.00
Computed Total Expenses
19,746.97
18,212.00
Net Profit or Loss
Store #1
$ 476.83
[1] $ 525.20 Store #2
(842.00)
(47.00)
Store #3
(118.80)
(38.00)
Computed Total Profit or Loss
($ 483.97)
[1] $ 525.20 *205 The investigation of petitioner's books and records pertaining to the years 1956 and 1957 revealed that petitioner did not keep adequate books and records from which his income could be determined. Respondent reconstructed the petitioner's income from his liquor store operations for the years 1956 and 1957 based on a 20 percent markup on the known cost of goods sold as follows: 1956
1957
Sales
$128,861.32
$141,538.02
Cost of Sales
107,384.44
117,948.35
Gross Profits
$ 21,476.88
$ 23,589.67
Expenses
$ 10,608.28
$ 13,088.89
Net Profit
$ 10,868.60
$ 10,500.78
J. L. Lobdell, a bookkeeper, was employed by the petitioner during the time the revenue agent was examining the petitioner's returns for 1956 and 1957. Lobdell became familiar with petitioner's business operations during 1956 and 1957, and assisted petitioner in regard thereto while petitioner's returns for 1956 and 1957 were being examined. On June 4, 1959, the petitioner executed Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment) in which he agreed to the assessment of *206 tax and additions to tax for the years 1956 and 1957 as follows: 1956
1957
Tax
$1,760.46
$1,654.60
Additions - Sec. 6653(b),
I.R.C. 1954
880.23
827.30
Total
$2,640.69
$2,481.90
At the time Webb executed the Form 870, he was accompanied by Lobdell who advised him to agree to the proposed deficiency and additions to tax. Both the revenue agent and Lobdell explained the proposed deficiencies and additions to tax to the petitioner before he signed the Form 870. The 120 percent markup figure used in 1956 and 1957 was a compromise figure in arriving at a settlement of the deficiency proposed for those two years. [1]
On several occasions in 1958 and 1959, Lobdell talked to Webb about the necessity of maintaining adequate records and recommended that Webb keep a detailed record of receipts for all expenditures and purchases and a daily record of all sales from each liquor store. In June 1959, the revenue agent orally advised petitioner that the internal revenue laws require all taxpayers to keep sufficient records *207 from which their true income can be determined. The revenue agent further orally advised petitioner to keep in permanent form a daily record of the money which he took in and of all purchase invoices and receipts. Petitioner understood both Lobdell and the revenue agent to have told him to keep records of invoices, expenses, and "of what [he] had taken in." On June 4, 1959, the revenue agent reported the inadequacy of petitioner's books and records to the district director of internal revenue, Dallas, Texas, and recommended that petitioner be notified officially of such inadequacy. On July 7, 1959, a letter dated July 2, 1959, was received by petitioner from the district director of internal revenue, Dallas, Texas, which letter apprised petitioner of his duty to keep accurate and complete business records and of his failure in the past to do so, reading in part as follows: * * * [Your] current records were found to be inadequate in the following respects: No books and records of any sort were maintained. Receipts were not deposited or recorded. Inventories were based on loose estimates rather than actual physical count and valuation. Rental income and expenses were not *208 recorded. * * *
Each taxpayer is required by law to make a return of his true income. He must, therefore, maintain such accounting records as will enable him to do so. * * *
This is notice to you of the requirements of the law and regulations with respect to maintaining such permanent books of account and records * * * as will enable you to make a return of your true income and also will enable examining officers of the Internal Revenue Service to determine the correct amount of income subject to tax. Petitioner was about 18 years old when he stopped attending school. He did not complete the fifth grade. However, petitioner is a person of at least average intelligence and average business understanding. Petitioner maintained no books or records of any kind showing his daily income from liquor sales during 1958, 1959, and 1960. He kept no cash disbursement or similar book containing his business expenses during said years. After being advised to maintain adequate records by Lobdell in the latter part of 1958, petitioner began keeping part of his invoices in a whiskey box. Some of the invoices were lost or misplaced by petitioner, so that he was unable to furnish *209 the revenue agent, who conducted a subsequent examination, with a complete record of his purchases during 1958, 1959, and 1960. Webb never has maintained adequate books and records from which the true income of his liquor store operations could be determined, and he never has kept an accurate record of his savings. Petitioner did not ring up all cash sales on the cash registers of his businesses and he did not deposit all of his receipts in his bank accounts. He kept no adequate record to determine the amounts he withdrew from the business for his personal use. Petitioner submitted to the revenue agent a "cash receipts book" containing weekly entries of his sales during 1960 which petitioner represented to be complete. Petitioner's cash receipts book for the taxable year 1960 contained entries for only 48 weeks of the year 1960 as to the three liquor stores which petitioner operated throughout that year. Petitioner's cash receipts book for the taxable year 1960 showed gross sales during 1960 of approximately $18,000 in excess of the gross sales figure which appears on petitioners' joint return for the year 1960. Petitioner was aware of the requirements to maintain adequate *210 books and records that would reflect his true income from his liquor store operations, but failed to keep such records. Petitioner knew that his sales and purchases as reported on his 1958, 1959, and 1960 returns were incorrect. Knowing that his records were incomplete, petitioner added up his expenses, receipts, and invoices for each year and submitted only the totals thereof without any supporting records or documents for 1958 to J. L. Lobdell and for 1959 and 1960, to Vernon E. Williams. Relying upon information furnished them by petitioner, Lobdell prepared petitioner's return for 1958, and Williams prepared petitioner's returns for 1959 and 1960. Petitioner commingled beyond identification the cash received from all of his liquor stores. Petitioner used part of the cash received from liquor sales to pay business and personal living expenses without first depositing the cash in his bank account. Petitioner deposited in his bank accounts only part of what he took in from his liquor store operations in 1958, 1959, and 1960. During said years petitioner deposited cash in one account at the South Oak Cliff State Bank. For about six months during the 3-year period, petitioner *211 also maintained an account at Fair Park National Bank, in which account liquor store income was deposited. Petitioner was unable to furnish the revenue agent all of his canceled checks and other banking records for 1958, 1959, and 1960. It was impossible to determine petitioner's actual income from the bank's microfilm of petitioner's canceled checks, bank statements and deposit slips, and the revenue agent found it impossible to reconstruct petitioner's net income by use of the net worth method. During the taxable years 1958, 1959, and 1960, the average cost per bottle of certain representative brands of liquors purchased by petitioner and the shelf prices thereof were as follows: [1] Unit Cost Shelf Price for
Brand
Size
1958
1959
1960
[2] 1959 [3] 1960-61 Gin
Gordon's
1/2 pt.
$1.02
$1.05
$1.45
$1.39
pt.
2.02
2.02
2.65
2.59
5th
3.08
3.95
3.95
Walker
1/2 pt.
$ .90
.92
.93
1.29
pt.
1.74
1.88
1.88
2.55
5th
Gilbey
1/2 pt.
.97
.99
.98
1.45
1.39
pt.
1.92
1.97
1.88
2.65
2.69
5th
2.99
3.05
3.01
3.95
3.95
Seagram's
1/2 pt.
1.03
1.03
1.11
1.39
pt.
2.00
2.08
2.18
2.69
5th
3.95
Vodkas
Toaka
1/2 pt.
.83
.84
.85
1.05
pt.
1.61
1.63
1.65
2.00
5th
2.48
2.45
2.54
3.00
Smirnoff
1/2 pt.
1.07
1.08
1.30
1.39
pt.
2.09
2.09
2.55
2.69
5th
3.22
3.25
3.95
3.95
Samovar
1/2 pt.
$ .93
$ .94
$1.35
$1.30
pt.
1.80
1.87
2.65
5th
2.76
2.82
3.95
3.85
Gilbey
1/2 pt.
$ .92
.91
.96
1.30
pt.
1.87
2.59
5th
Bourbons
Old Taylor
1/2 pt.
1.25
1.26
1.27
1.65
1.59
pt.
2.45
2.49
2.50
3.25
3.35
5th
3.80
3.75
3.92
4.90
4.99
I. W. Harper
1/2 pt.
1.27
1.27
1.59
pt.
2.45
2.50
3.35
5th
3.74
3.79
4.99
Ky. Tavern
1/2 pt.
1.24
1.25
1.65
1.59
pt.
2.44
2.45
3.25
3.35
5th
3.75
3.72
4.90
4.99
Old Crow
1/2 pt.
1.17
1.16
1.17
1.55
pt.
2.30
2.28
2.28
2.99
5th
3.53
3.45
3.45
4.59
Champion
1/2 pt.
1.20
1.23
1.65
1.69
pt.
2.30
2.35
3.25
3.35
5th
3.72
4.90
Scotches
Johnny Walker Red
1/2 pt.
1.69
1.71
2.35
pt.
2.72
2.76
3.40
5th
5.21
5.21
5.30
6.35
Martin's V.V.O.
1/2 pt.
1.60
2.25
pt.
2.58
3.25
5th
4.88
5.99
Wine
Thunderbird
Split
.18
.25
1/10th
.34
.35
.45
1/5th
.56
.58
.75
*212 The following brands of liquor in half pint bottles were sold by petitioner most frequently during the years 1958, 1959, and 1960: A. Whiskeys and bourbons: 1. Old Crow 2. Old Taylor 3. Kentucky Tavern 4. I. W. Harper B. Gins: 1. Gilbey 2. Gordon 3. Seagram's C. Vodka: 1. Toaka D. Wine: 1. Thunderbird The 1961 (retail) shelf prices of liquor in petitioner's stores were substantially the same as the 1960 prices thereof. The shelf prices of petitioner's liquor stocks during 1958 and 1959 were substantially the same as the prices thereof during 1960. There had been a minor shelf price change in 1960. On their joint returns for 1958, 1959, and 1960, petitioners reported the following inventories, inventory purchases, and costs of sales: 1958
1959
1960
Opening Inventory
$ 10,000.00
$ 10,000.00
$ 10,000.00
Inventory Purchases
88,419.30
87,551.00
97,670.70
Total
$ 98,419.30
$ 97,551.00
$107,670.70
Ending Inventory
10,000.00
10,000.00
12,000.00
Cost of Sales
$ 88,419.30
$ 87,551.00
$ 95,670.70
*213 Petitioners' actual inventory purchases during 1958, 1959, and 1960, were as follows: 1958
1959
1960
Liquor and Wine
$151,773.13
$173,006.08
$179,055.34
Beer
12,949.16
16,417.88
23,641.60
Total
$164,722.29
$189,423.96
$202,696.94
The petitioners' ending inventory on December 31, 1958, and opening inventory on January 1, 1959, was $10,000. Petitioners' ending inventory for December 31, 1959, and beginning inventory for January 1, 1960, was also $10,000 and their closing inventory on December 31, 1960, was in the amount of $12,000. For the years 1956 and 1957, Webb agreed to certain adjustments, one of which was a closing inventory on December 31, 1957, of $13,000, which amount correctly reflects petitioners' opening inventory of January 1, 1958. Petitioners' actual inventories, inventory purchases, and costs of sales during 1958, 1959, and 1960, were as follows: 1958
1959
1960
Opening Inventory
$ 13,000.00
$ 10,000.00
$ 10,000.00
Inventory Purchases
164,722.29
189,423.96
202,696.94
Total
$177,722.29
$199,423.96
$212,696.94
Ending Inventory
10,000.00
10,000.00
12,000.00
Cost of Sales
$167,722.29
$189,423.96
$200,696.94
*214 On their joint returns for 1958, 1959, and 1960, petitioners reported income from their retail liquor businesses as follows: Taxable Years
1958
1959
1960
Receipts
$101,218.73
$101,121.62
$110,381.12
Cost of Sales
91,345.05
91,000.58
100,150.70
Gross Profit
$ 9,873.68
$ 10,121.04
$ 10,230.42
Business expense
10,001.13
10,008.60
9,622.36
Net Profit or (Loss)
($ 127.45)
$ 112.44
$ 608.06
It was impossible for respondent to determine petitioners' income during the years 1958, 1959, and 1960, from the records for that period maintained by Webb. Respondent's agents used the percentage markup method to determine petitioners' unreported income from liquor operations during the years 1958, 1959, and 1960, using a 25 percent markup on cost of sales. Respondent determined that during the taxable years 1958, 1959, and 1960, petitioners had net profits and unreported income from their retail liquor operations as follows: Taxable Years
1958
1959
1960
Receipts (125% of Cost of Sales)
$209,652.86
$236,779.95
$250,871.15
Cost of Sales
167,722.29
189,423.96
200,696.92
Gross Profit
$ 41,930.57
$ 47,355.99
$ 50,174.23
Business Expense
12,376.88
13,673.87
16,965.56
Net Profit
$ 29,553.69
$ 33,682.12
$ 33,208.67
Net Profit Reported
(127.45)
112.44
608.06
Unreported Net Income
$ 29,681.14
$ 33,569.68
$ 32,600.61
*215 In 1959 petitioner purchased 2 new airconditioned Cadillacs, paying therefor approximately $12,000. Otherwise he lived simply in a very modest run-down house which he had occupied for many years. Ultimate Findings of Facts The average retail markup on petitioner's liquor inventories during the years 1958, 1959, and 1960, was not less than 25 percent of petitioner's cost of sales. Petitioners understated their net income from liquor operations in their joint returns for the years 1958, 1959, and 1960, in the respective amounts of $29,681.14, $33,569.68, and $32,600.61, and underpaid their income taxes for those years accordingly. A part of each such underpayment is due to fraud with intent to evade income taxes. Petitioners are liable for the additions to tax for fraud in 1958, 1959, and 1960, under section 6653(b) of the 1954 Code. Opinion Issue 1. Use of Percentage Markup Method The first issue presented for decision is whether or not respondent was justified in rejecting petitioner's books and records as inadequate and inaccurate, and in reconstructing his retail sales income for the taxable years 1958, 1959, and 1960, by applying a percentage markup of gross profit *216 on sales. Petitioner contends that the use of this technique by respondent to the facts of record is wholly inapplicable and improper. For reasons hereinafter discussed, we disagree with petitioner. Individuals subject to Federal taxation are required to keep such accounting records, including inventories when sales of merchandise are an income-producing factor, as will enable them to determine and report their true income. Section 1.446-1, Income Tax Regs. If the method of accounting does not clearly reflect the income, the respondent is authorized to use such method as, in his opinion, does clearly reflect the income. Section 446(b) of the 1954 Code. If the respondent, upon the audit of a taxpayer's return, finds that the latter's records are incomplete, inaccurate, or otherwise unsatisfactory, he need not accept the filed return as complete and may seek elsewhere for such information as he requires. Melvin E. Tunningley, 22 T.C. 1108, 1117 (1954); Louis Halle, 7 T.C. 245, 249-250 (1946), affd. 175 F. 2d 500 (C.A. 2, 1949), certiorari denied 338 U.S. 949 (1950); Appeal of Elwood Banfield, 1 B.T.A. 665 (1925). *217 While a taxpayer operating a small business may not be expected to keep an elaborate set of books of account, he should keep sufficient records that can be demonstrated to correctly reflect the income of the business. Such was not the case with the records maintained by Webb. Petitioner testified that he did not keep complete records of his liquor store operations and such records that he maintained were, in part, lost or misplaced. As indicated in our Findings, at no time during the period in question did Webb keep a daily record of his sales receipts or expenditures. Prior to the latter part of 1958, Webb maintained no records and made no endeavor to do so, except perhaps occasional records of inventory purchases and of expense payments. In late 1958, petitioner began keeping invoices in one of his stores. However, he admitted losing or misplacing even some of these invoices. Webb also continued to retain evidences of some of his expenses. During 1960, petitioner allegedly maintained a cash receipts book containing weekly entries of sales by each liquor store operated by him. This book contained only 48 entries for each of the three liquor stores operated throughout 1960 by him. *218 There were less than 48 entries for the fourth store opened sometime during 1960. The total sales shown in said book exceeded by about $18,000 the sales figure reported by petitioner on his return for 1960. The inadequacy and unreliability of petitioner's records is demonstrated further by the disparity between his actual purchases and the sales and cost of sales figures reported by him on his returns. On his returns for the years in question petitioner understated both the total receipts from and the cost of sales for his retail liquor businesses by approximately 50 percent. In this connection, petitioner testified that he had no idea as to the amount of sales he had during each of the taxable years in question. He testified further that he had no way from any books and records he maintained to know how much each store was earning or losing during the years involved herein. In addition to petitioner's failure to maintain adequate records of his income-producing activities, he retained part of the money he took in from his liquor stores during the years involved and used the receipts directly for the cash payment of various business and personal expenses incurred by him. Webb also *219 commingled the receipts from the four stores which he operated during the period in question. Furthermore, he conducted a substantial amount of his business on a cash basis without depositing all receipts in his bank account. Under the circumstances, respondent's agent was unable to make any determination of petitioner's actual income for the years in question by the bank deposit or net worth method. Since petitioner's cost of sales in each of the taxable years involved was known with certainty, respondent used the percentage markup approach in reconstructing petitioner's income. In essence, the percentage markup method substitutes a mathematical formula for a taxpayer's missing or inadequate records as the best evidence of his income. Petitioner submitted a schedule, which purports to be a so-called net worth statement, in which he attempts to establish that the profit realized by him in his liquor store operations was only $3,750 in each of the taxable years involved herein. On the basis of petitioner's schedule, the percentage markup on cost of goods sold during the taxable period under review would be less than 10 percent. The revenue agent testified that it was not possible *220 to determine petitioner's income on a net worth approach because Webb dealt largely in cash and did not deposit all of his receipts in his bank accounts. Nonetheless, it is recognized that the respondent need not prove the impossibility of the use of the so-called net worth method or bank deposit method of reconstructing income before computing a taxpayer's income by the percentage markup method. When the books of the taxpayer do not clearly reflect his income, any of these methods or a combination of them, is available to respondent. Bernstein v. Commissioner, 267 F. 2d 879 (C.A. 5, 1959), affirming a Memorandum Opinion of this Court. In support of his contention that respondent's use of the percentage markup method is arbitrary, excessive and erroneous, petitioner relies, inter alia, on Gasper v. Commissioner, 225 F. 2d 284 (C.A. 6, 1955), reversing in part a Memorandum Opinion of this Court. In Gasper, where the taxpayer's income from the operation of a bar for the taxable years involved therein was reconstructed on a percentage markup on cost of goods sold, the Court of Appeals for the Sixth Circuit held that there was no necessity to resort to that *221 technique or any substitute method since there were sufficient facts available to respondent to accurately determine the taxpayer's income. We find Gasper, supra, inapposite to the instant case. Here, there are no basic facts from which the petitioner's sales can be determined accurately without resorting to the percentage markup method. Under the circumstances involved herein, we believe that respondent's approach is an eminently fair one and the most satisfactory one at hand. Since petitioner's true income from liquor store operations during 1958, 1959, and 1960, could not be determined from his incomplete, inaccurate, and misleading records, we are convinced that respondent was justified in his use of the percentage markup method in reconstructing petitioner's income, and that use of that technique was not arbitrary within the rule of Helvering v. Taylor, 293 U.S. 507 (1935). Issue 2. Understatement of Income We turn to the question as to whether this method of percentage of gross profits on sales applied by respondent in making his determination for the years in question properly reflected petitioner's income for those years. Respondent used a markup *222 figure of 125 percent of petitioner's cost of sales to determine petitioner's gross sales from which petitioner's gross profits were determined. Respondent's determination is presumptively correct and petitioner has the burden to demonstrate error therein. Snell Isle, Inc., v. Commissioner, 90 F. 2d 481, 482 (C.A. 5, 1937), certiorari denied 302 U.S. 734 (1937). Petitioner contends that the 125 percent markup is clearly arbitrary and excessive. Respondent, in opposition, urges that this percentage, if in error at all, errs in favor of petitioner. It is respondent's position that computations based on petitioner's stipulated wholesale costs of liquor show that petitioner's markup on virtually all items sold most frequently was in excess of 125 percent. The 1959 and 1960 average markup on each type of liquor substantially exceeded 125 percent. Petitioner's shelf prices during 1958 are unknown, and, therefore, markup computations for that year cannot be made. However, the record shows that although petitioner's wholesale costs of some brands increased slightly in 1960, the shelf prices throughout all the years in question remained substantially the same. Admittedly *223 the schedule used by respondent to establish petitioner's markup on his various liquor items is not statistically infallible. Petitioner's average markup on his liquor operations as a whole cannot be determined precisely, because the quantities of each brand sold in the various unit sizes are unknown and, hence, the individual items cannot be weighted. The same is true of the markup on each particular type of liquor as a class. Despite these minor defects, however, we believe that the markup of 125 percent, under the circumstances of this case, is reasonable. Petitioner's overall 1959 and 1960 markups on all of his most popular brands in all sizes were 134.28 and 130.50 percent, respectively, and on all brands in the most frequently sold one-half pint sizes were 136.68 and 132.64 percent, respectively. At the very least, petitioner's actual average markup exceeded by nearly 6 percent the 125 percent markup figure with which respondent determined petitioner's income for 1958 through 1960. We find no merit in petitioner's contention that the respondent did not properly use the percentage markup method because specific weights were not assigned to the various bottles sold by petitioner. *224 Petitioner argues that by not using any weighing techniques, respondent "juggled" averages so that the high markup shelf price on half pints of Scotch and other brands rarely sold distort the shelf price markup average. During the three years involved herein petitioner purchased in excess of $500,000 of liquor, beer, and wine, and it would have been extremely difficult, if not impossible, to assign weights to the thousands of bottles of different brands and sizes sold by petitioner. Basic facts necessary to compute any type of weighted average were not available and the use of such method was not feasible under the circumstances herein. The quantities of each brand sold in the various unit sizes are unknown. The parties did not stipulate the cost of each bottle in each size sold by petitioner in each of the years in question. However, the evidence shows that about 70 percent or more of all sales were in one-half pints of Old Taylor, Old Crow, Kentucky Tavern, and I. W. Harper. The overall markup on these half pints was 136.68 percent in 1959 and 132.64 percent in 1960. Thus, even assuming that there was a very low markup on all other sales, the overall average markup would still exceed *225 125 percent. In our view, Webb has not demonstrated that he is entitled to any discounts other than the amounts already taken into consideration by respondent. Webb testified that nearly half of all sales was at a discount and that such discounts ranged from a few cents to 10 or 15 cents per bottle. In essence, petitioner argues that liquor sales were not made at shelf price but that very substantial portions of his sales were made well below shelf price and at a minimal markup. The evidence presented by petitioner with respect to the alleged discounts is vague and unconvincing. Webb managed only one store and seemed to be unfamiliar with whether discounts were given in other stores, and, if so, the frequency or the amount of such discounts. On all of the evidence before us, we conclude that most of petitioner's sales were at shelf prices; the evidence of "knocking off" the odd pennies and selling at discount in some instances is insufficient to affect or overcome the presumption of correctness of respondent's determination that petitioner's overall markup was 25 percent of cost, so that his sales were made at 125 percent of cost on an overall basis. There is no affirmative evidence *226 in the record to prove the similarity of any prices used by comparable liquor store dealers in petitioner's business community or what their practice was with respect to discounts. We believe that respondent's reduction of the computed shelf selling prices of over 130 percent to 125 percent represents a substantial and liberal allowance for all possible discounts, and a further reduction below said percentage, as urged by petitioner, is not warranted by the evidence presented. Just as in all methods of reconstruction of income, the results are less accurate and satisfactory than that which would have been obtained if complete and accurate records had been kept in the first instance by the taxpayer. Likewise, we reject petitioner's contention that he is entitled to a reduction in the markup percentage determined by respondent because of theft and bad debts. Suffice it to say, the evidence adduced by petitioner to prove thefts by his employees during the years in question is vague, generalized, and unconvincing; at most, we might conclude that a possibility of theft has been shown. This is not sufficient. With respect to the alleged losses sustained through credit sales to customers, *227 again petitioner has not established the underlying facts which would entitle him to further reduce the markup. He has merely hinted that there was some possibility of loss because of credit sales, not later collected. This helps him little in carrying his burden here. It is noteworthy that the 120 percent markup sales price figure, to which petitioner agreed for the years 1956 and 1957, was a compromise figure in arriving at a settlement of the deficiency proposed for those two years. This percentage figure, in our view, is not determinative of the issue here for subsequent years. There is no evidence before us of the average cost per bottle of any of the brands sold in 1956 and 1957. Nor is there any evidence that the wholesale costs of liquor, beer, and wine in 1956 and 1957 were the same as in the subsequent years involved herein. That the parties agreed on a settlement based on a 20 percent markup for two earlier years does not determine the correctness or incorrectness of the 25 percent markup used by respondent in his deficiency determination before us. On the entire record presented, viewed in the light of the foregoing, we believe that respondent's reduction of 6 percent *228 of petitioner's cost of sales is a wholly adequate allowance for trivial discounts on sales, possible employee dishonesty, occasional losses due to minor sales on credit, or other alleged losses which petitioner may have absorbed, but which petitioner has not established to our satisfaction. Kurnick v. Commissioner, 232 F. 2d 678, 681 (C.A. 6, 1956), affirming a Memorandum Opinion of this Court. Petitioner's evidence falls far short of even casting serious doubt on the correctness of respondent's determination. Issue 3. Fraud We now consider the question of whether or not a part of the underpayment due from the petitioner for each of the years 1958 to 1960, inclusive, was due to fraud with intent to evade tax within the meaning of section 6653(b) of the 1954 Code. The burden of proof with respect to fraud is upon the respondent and he must establish fraud on the part of the petitioner by clear and convincing evidence. Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court; and W. A. Shaw, 27 T.C. 561 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958). In sustaining his burden of proof respondent *229 is not required to prove the precise amount of the underpayment resulting from fraud, but only that "any part" of the underpayment is attributable thereto. See Estate of W. Y. Brame, 25 T.C. 824 (1956), affd. per curiam 256 F. 2d 343 (C.A. 5, 1958). Our conclusions with respect to the issue of fraud for the taxable years 1958 through 1960, are based upon consideration of the entire record properly before us, and we are not limited to a consideration of respondent's affirmative evidence. Frank Imburgia, 22 T.C. 1002, 1014 (1954); Wallace H. Petit, 10 T.C. 1253, 1257 (1948); L. Schepp Co., 25 B.T.A. 419, 440 (1932). We also recognize that in this, as in many fraud cases, proof of fraud if it is to be established must depend in some respects upon circumstantial evidence. Fraudulent intent can seldom be established by a single act or by direct proof of the taxpayer's intention. It is usually found by surveying his whole course of conduct and is to be adduced as any other fact from all the evidence of record and inferences properly to be drawn therefrom. M. Rea Gano, 19 B.T.A. 518, 532 (1930). Our finding *230 of an understatement in taxable income for the petitioner for each of the years in question for the purposes of the deficiencies involved was based in some respects upon petitioner's failure to meet his burden of proof. We are mindful that respondent cannot meet his own burden of establishing fraud on the basis of petitioner's failure to discharge the burden of proving error in the determination of deficiencies, and we do not, of course, rest our findings on that basis. We have held that a mere understatement of income does not establish fraud. James Nicholson, 32 B.T.A. 977 (1935), aff'd. 90 F. 2d 978 (C.A. 8, 1937). The existence of fraud with intent to evade tax must be affirmatively established. Drieborg v. Commissioner, 225 F. 2d 216, 218 (C.A. 6, 1955), affirming in part a Memorandum Opinion of this Court. There must be independent evidence which shows a willful intent to evade tax. In that connection, the Supreme Court in Spies v. United States, 317 U.S. 492 (1943), said at p. 499: Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define *231 lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished "in any manner." By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. * * * After analyzing all of the evidence in this case, bearing in mind the above-stated principles, we are convinced that petitioner knowingly received substantial taxable income during each of the years 1958 through 1960, from their retail liquor store operations in excess of that reported on their joint returns for those years, and that in each of said years, a part of each deficiency here involved was due to fraud with intent to evade taxes. The understatements of income in each of the years 1958 to 1960, inclusive, *232 were both substantial in amount and substantial in proportion to the amounts reported. Petitioners reported on their joint returns taxable income of $273.36, $192.25, and $296.73 during the taxable years 1958, 1959, and 1960, respectively. As to petitioners' retail liquor operations, said returns showed for the respective years in question a net loss of $127.45, a net profit of $112.44, and a net profit of $608.06. Even if this case were devoid of the usual indicia of fraud, the courts have held that consistent understatements of income in substantial amounts over a number of years by knowledgeable taxpayers, standing alone, are persuasive evidence of fraudulent intent to evade taxes. Merritt v. Commissioner, 301 F. 2d 484 (C.A. 5, 1962); Cefalu v. Commissioner, supra; Lillian Kilpatrick, 22 T.C. 446 (1954), affd. 227 F. 2d 240 (C.A. 5, 1955); Shahadi v. Commissioner, 266 F. 2d 495 (C.A. 3, 1959); Schwarzkopf v. Commissioner 246 F. 2d 731 (C.A. 3, 1957), affirming on this point a Memorandum Opinion of this Court; Bryan v. Commissioner, 209 F. 2d 822, 828 (C.A. 5, 1954), certiorari denied *233 348 U.S. 912 (1955); Jack M. Chesbro, 21 T.C. 123, 131 (1953), affd. 225 F. 2d 674 (C.A. 2, 1955), certiorari denied 350 U.S. 995 (1956); Rogers v. Commissioner, 111 F. 2d 987 (C.A. 6, 1940), affirming 38 B.T.A. 16 (1938). In Epstein v. United States, 246 F. 2d 563 (C.A. 6, 1957), certiorari denied 355 U.S. 868 (1957), the Court stated, at p. 933: The consistent understatement of large amounts of income for a number of years is evidence of willful intent to evade. Kurnick v. Commissioner, supra, 232 F. 2d 681; Drieborg v. Commissioner of Internal Revenue, 6 Cir. 225 F. 2d 216. In Holland v. United States, supra, 348 U.S. 139, * * * the Supreme Court declared that "evidence of a consistent pattern of underreporting large amounts of income" will support "an inference of willfulness." We are mindful that fraud cannot be inferred from a mere possible inadvertent understatement of income. Holland v. United States, 348 U.S. 121 (1955). For several consecutive years, petitioners have followed a consistent pattern of grossly understating *234 purchases and sales, culminating in a total failure to report income fully for the years 1956 through 1960. On their joint returns for 1958 through 1960, the years before us, petitioners understated in substantial amounts their sales, costs of sales, and income from their liquor store business. In virtually every taxable year involved, petitioners have reported about 50 percent of their sales and costs of sales. Although inventories have remained constant, petitioner's actual inventory purchases in each year have exceeded by 75 to 100 percent even the sales in that year reported by them on their return. Thus, in 1960 petitioners reported sales of $110,381.12, but in fact their inventory purchases during that year alone totaled $202,696.94. The understatements of sales and cost of sales by petitioners have resulted in a substantial disparity between their reported income and their actual income from liquor operations for each of the years 1958 through 1960. Comparison of petitioner's actual income with their reported income for the years in question shows a consistent pattern of willfully failing to report large amounts of income for several consecutive years. As part of this pattern, *235 we note that petitioners previously agreed to assessments of additions for fraud to the deficiencies determined for the years 1956 and 1957. The failure to report such large amounts on petitioners' income tax returns cannot be regarded as having been due merely to neglect, as petitioners aver, but must be deemed to have been motivated by a fraudulent intent to evade taxes. Estate of Joseph Nitto, 13 T.C. 858, 868 (1949). Petitioners' understatements of income were so large, regular and frequent, extending over a period of at least three years, 1958 to 1960, inconclusive, that there is no escape from the inference of a deliberate intention to defraud the Government of the taxes lawfully due it. Petitioners' protestations that he was not making any profit from his enterprises or was unaware that he was under-reporting income, are certainly negatived to some extent by the undisputed evidence that in 1959 he purchased two air-conditioned Cadillacs. He does not attempt to explain how he did this on taxable income of less than $300 per year, as reported for 1958, 1959, and 1960, nor does he establish how he could make monthly payments of from $300 to $400 in cash on these purchases *236 during 1959 and 1960 without conscious knowledge that he was realizing taxable income from his liquor store operations which he was failing to report in his returns. In addition to the consistent pattern of substantial understatements, the record is replete with facts and convincing circumstantial evidence which sustain the view that respondent has met his burden of establishing that the petitioners knowingly and intentionally evaded their taxes during the taxable years 1958 through 1960. Without suggesting that the following discussion is at all complete, we merely advert to the following indicia of fraud. Preliminarily, we think there can be no doubt, under the circumstances, that the failure to keep records of all earnings, is significant evidence of fraud. Baumgardner v. Commissioner, 251 F. 2d 311 (C.A. 9, 1957), affirming a Memorandum Opinion of this Court. To hold otherwise would, as the Supreme Court stated in United States v. Johnson, 319 U.S. 503, 518 (1943), "* * * be tantamount to holding that skilful concealment is an invincible barrier to proof. * * *" Moreover, as was stated by the Court of Appeals for the District of Columbia in O'Laughlin v. Helvering, 81 F. 2d 269, 270 (1935), *237 at 270: Taxation is not only practical - it is vital. The obligation of good faith and fair dealing in carrying out its provisions is reciprocal and, as the government should never be overreaching or tyrannical, neither should a taxpayer be permitted to escape payment by the concealment of material facts. * * * See also Anderson v. Commissioner, 250 F. 2d 242 (C.A. 5, 1957), affirming a Memorandum Opinion of this Court. During each of the years involved herein Webb failed to maintain adequate books and records of all of his business receipts, as required by law. Section 6001 of the 1954 Code, and section 1.6001-1, Income Tax Regs. It would serve no useful purpose to repeat in detail the absence of reliable and complete records for petitioner's business during the period in question. As set forth in our Findings, such records were virtually nonexistent, except for a cash receipts book which contained incomplete, inaccurate and misleading entries for petitioner's sales during 1960. On several occasions during 1958 and 1959, several individuals, including the district director of internal revenue at Dallas, Texas, advised or warned petitioner *238 of the necessity of keeping adequate books and records for his stores. Petitioner's continued failure to improve the sufficiency of his records after such admonition is a significant indicia of fraud. Abraham Galant, 26 T.C. 354, 365 (1956). The taxpayer is obliged by law to keep complete records of his income-producing activities for inspection by internal revenue agents, and he cannot expect us to speculate as to the underlying facts. That Webb may have been very busy and too tired to keep adequate records, in the context of the instant case, is not a reasonable explanation of the course pursued by him. Cefalu v. Commissioner, supra; Woodham v. Commissioner, 256 F. 2d 201 (C.A. 5, 1958), affirming a Memorandum Opinion of this Court. Additional evidence of fraud is found in petitioner's deliberately falsifying his returns for 1958, 1959, and 1960. Although petitioner knew that his records did not reflect his income accurately, he contrived figures for total liquor sales and expenses for each of the years involved herein and submitted them to Lobdell, who prepared his 1958 return, and to Vernon E. Williams, who prepared his returns for 1959 *239 and 1960. Petitioner testified that he could not properly advise these individuals as to the amount of his receipts during said years because he did not know the amount thereof, but that they informed him that they would be able to compute his income from his invoices. Merritt v. Commissioner, supra; see Victor A. Dorsey, 33 B.T.A. 295, 300 (1935). It is axiomatic that taxpayers cannot escape responsibility for errors, not otherwise excusable, by shifting the blame to those who prepare the return. Dorothy L. Sutherland, 32 T.C. 862, 866, 868 (1959); Cefalu v. Commissioner, supra; M. Rea Gano, supra; D. C. Clarke, 22 B.T.A. 314, 328 (1931); and Sol H. Goldberg, 36 B.T.A. 44, 53 (1937). This would be particularly true in the instant case where important data was withheld from the preparer of the return or wrong information was given to him. Russell C. Mauch, 35 B.T.A. 617 (1937), affd., 113 F. 2d 555 (C.A. 3, 1940); Estate of E. A. Wickham, 22 B.T.A. 1393, 1398 (1931), affd. 65 F. 2d 527 (C.A. 8, 1933); Merritt v. Commissioner, supra. *240 Although Webb had limited formal education, we believe that his business experience and acumen, plus his general intelligence, must have made him aware of the record-keeping requirements of the revenue laws and his responsibility to report his income accurately. Hence, it is not conceivable that petitioner's dereliction in this regard resulted from ignorance. Under the circumstances which showed not mere carelessness or oversight but a positive evasion of his obligation to account for and report his income, we find that petitioner acted with a willful disregard of his duty to report the true amount of his income. Upon the basis of the foregoing, and consideration of the record as a whole, we hold that some part of the underpayment for each of the years 1958, 1959, and 1960, was due to fraud with intent to evade taxes. Decision will be entered under Rule 50. Footnotes
1. Arithmetic error on return uncorrected.↩
1. As hereinafter used "markup" in excess of 100 percent refers not to the percentage above cost, but to cost plus the markup percentage.↩
1. Unit costs are stipulated. ↩
2. 1959 shelf prices were obtained by the revenue agent conducting the first examination for the years 1956 and 1957. ↩
3. 1960-61 shelf prices were obtained by the revenue agent who conducted the examination for the years here in controversy.↩