T.C. Memo. 1999-423


UNITED STATES TAX COURT


JERRY L. CRABTREE, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 2917-97, 2918-97, Filed December 29, 1999.
          3933-97, 4026-97.


<u>James L. Chase</u>, for petitioners.

<u>Alan Friday</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined the following

deficiencies in and penalties with respect to the Federal

income tax of petitioner Jerry L. Crabtree:

---

[1]Cases involving the following petitioners are con-
solidated herewith:  Eddie L. Crabtree, docket No. 2918-97;
Crabtree Investments, Inc., docket Nos. 3933-97 and 4026-
97.

| Year | Deficiency | Fraud Penalty Sec. 6663 |
|------|-----------|------------------------|
| 1992 | $97,728 | $73,296 |
| 1993 | 49,310 | 36,983 |
| 1994 | 76,554 | 57,416 |

Unless stated otherwise, all section references are to the Internal Revenue Code as in effect during the years in issue.

Respondent determined the following deficiencies in and penalties with respect to the Federal income tax of petitioner Eddie L. Crabtree:

| Year | Deficiency | Fraud Penalty Sec. 6663 |
|------|-----------|------------------------|
| 1992 | $99,346 | $74,510 |
| 1993 | 50,523 | 37,892 |
| 1994 | 95,103 | 71,327 |

Respondent also determined the following deficiencies in and penalties with respect to the Federal income tax of petitioner Crabtree Investments, Inc. (Crabtree Investments):

| Year | Deficiency | Fraud Penalty Sec. 6663 |
|------|-----------|------------------------|
| 1992 | $245,051 | $183,788 |
| 1993 | 103,218 | 77,414 |
| 1994 | 118,840 | 89,130 |

Each petitioner filed a timely petition for redetermination in this Court, and their cases were consolidated for trial, briefing, and opinion by order of

the Court issued pursuant to Rule 141(a) of the Tax Court Rules of Practice and Procedure. In this opinion, all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues for decision are: (1) Whether Crabtree Investments underreported its gross income for 1992, 1993, and 1994; (2) if Crabtree Investments underreported income, whether petitioners Jerry L. and Eddie L. Crabtree each received constructive dividends from the corporation in 1992, 1993, and 1994 of one-half of the gross income that went unreported; (3) whether each petitioner is liable for the fraud penalty under section 6663 for the years in issue; and (4) if the fraud penalty is not applicable, whether each petitioner is liable for the accuracy-related penalty under section 6662(a) attributable to negligence or disregard of rules or regulations. Petitioners do not contend that the period of limitations on assessments set forth in section 6501 applies in these cases.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time of

trial, petitioner Jerry Crabtree and her son, petitioner Eddie Crabtree, each owned 50 percent of the stock of Crabtree Investments. They served as the only officers of the corporation. At the time they filed their petitions in this Court, they resided in Pensacola, Florida. Crabtree Investments, a Florida corporation, was incorporated on April 1, 1985, and maintained its principal place of business in Pensacola, Florida, at the time the instant petitions were filed on its behalf.

During the years in issue, Crabtree Investments operated a bar and package store in Pensacola, Florida, trading under the name Justins. Before the incorporation of Crabtree Investments, the individual petitioners had owned and operated Justins since 1983 or 1984. Justins consists of an L-shaped building with the package store in the front and a country and western bar in the rear of the building. Justins is located near a number of large manufacturing companies.

During the years in issue, Ms. Crabtree managed the package store, which generally was open Tuesday through Saturday from 1 p.m. until 7 p.m. Mr. Crabtree managed the bar, which was open daily from 6 p.m. until 2:30 a.m. The bar had a maximum seating capacity of 250 persons and

usually featured live bands on Friday and Saturday nights. The bar sold prepackaged snacks and had a pay telephone.

Ms. Crabtree handled all of the bookkeeping for the package store and the bar during the years in issue. For Federal income tax purposes, Crabtree Investments reported income using the calendar year and a hybrid method of accounting, the cash receipts and disbursements method for sales, and the accrual method for purchases.

Petitioners' accountant, Mr. Richard Morton, prepared a general ledger and other financial records for Crabtree Investments for each of the years in issue. The general ledger for each year itemizes on a monthly basis the checks written on a checking account at First Union Bank maintained on behalf of Crabtree Investments. Mr. Morton prepared the general ledgers from the records that the individual petitioners provided to him every month. These records included Crabtree Investments' check stubs, bank statements, daily reports, and other records. On the basis of that information, Mr. Morton reconciled the bank account and prepared a sales journal, sales tax returns, payroll reports, and payroll tax deposits. Mr. Morton also prepared the corporation's income tax returns from the above information. Mr. Morton did the audit of the records of Crabtree Investments.

The general ledgers prepared by Mr. Morton include a liability account entitled "Loans From Shareholders". The balance of that account at the end of 1991 through 1994 is as follows:

| 1991 | $44,326.74 |
|------|-----------|
| 1992 | 44,326.74 |
| 1993 | 69,910.18 |
| 1994 | 100,228.68 |

The individual petitioners maintained two joint bank accounts during the years in issue. One joint account was at AmSouth Bank of Florida. The aggregate cash deposits, aggregate noncash deposits, aggregate withdrawals, and the yearend balance of that account for 1991 through 1994 are as follows:

| Year | Cash Deposits | Noncash Deposits | Withdrawals | Balances |
|------|---------|---------|-------------|----------|
| 1991 | -- | -- | -- | [1]$82,284.35 |
| 1992 | $40,305 | $2,705.02 | $55,316.82 | 69,977.55 |
| 1993 | 27,936 | 9,872.85 | 92,533.16 | 15,253.24 |
| 1994 | 3,200 | 73,508.80 | 82,687.85 | 9,274.19 |

[1] Balance on Jan. 28, 1992.

The other joint account was at First Union National Bank of Florida, formerly Southeast Bank of West Florida. The aggregate cash deposits, aggregate noncash deposits, aggregate withdrawals, and the yearend balance of that account for 1991 through 1994 are as follows:

| Year | Cash Deposits | Noncash Deposits | Withdrawals | Balances |
|------|------|------|------|------|
| 1991 | -- | -- | -- | $2,513.21 |
| 1992 | $34,795.83 | $542.86 | $36,694.70 | 1,157.20 |
| 1993 | 25,500.00 | -- | 24,140.78 | 2,516.42 |
| 1994 | 14,300.00 | 377.00 | 15,694.50 | 1,498.92 |

Respondent audited Crabtree Investments' corporate income tax returns for taxable years 1992, 1993, and 1994. During the audit, petitioners provided the following records to the revenue agent: Canceled checks, purchase orders, daily reports, cash register tapes, summaries of the cash register transactions referred to as Z tapes, deposit slips, and general ledgers. The revenue agent analyzed the corporation's bank account records. She found a substantial disparity between the total deposits made to the bank account at First Union Bank and the sales reported on the corporation's tax return for 1992. She also found that relatively little cash had been deposited into the account despite the cash nature of the business.

The revenue agent determined that the records of Crabtree Investments were insufficient to determine gross income. Therefore, she recomputed Crabtree Investments' gross income for 1992, 1993, and 1994, both in the package store and in the bar using the unit markup method. As the starting point for the reconstruction, the revenue agent

obtained from Ms. Crabtree the original purchase orders for beer and liquor purchases.

All of Crabtree Investments' original records that were provided to the revenue agent, other than the general ledgers, were returned to petitioners and afterwards lost in the fire that destroyed Justins in 1996. They were not available at trial.

Respondent's determination of Crabtree Investments' unreported income for 1992, 1993, and 1994 is based upon eight different categories of income, as summarized in the following schedule:

|   |   | 1992 | 1993 | 1994 |
|---|---|---|---|---|
| a. | Bar sales | $938,199 | $397,502 | $426,160 |
| b. | Package store sales | 54,041 | 63,943 | 99,511 |
| c. | Cover charges | 91,000 | 91,000 | 91,000 |
| d. | Vending machine receipts | 7,954 | 6,944 | 6,714 |
| e. | Food sales | 6,500 | 6,500 | 6,500 |
| f. | Flower sales | 2,314 | 1,220 | -0- |
| g. | Coke, juice & coffee | 19,435 | 19,435 | 19,435 |
| h. | Pay telephone receipts | 2,080 | 2,080 | 2,080 |
|   | Total | 1,121,523 | 588,624 | 651,400 |
|   | Gross receipts or sales reported on return | 479,829 | 263,151 | 229,508 |
|   | Adjustment | 641,694 | 325,473 | 421,892 |

On the basis of the above adjustments for 1992, 1993, and 1994, respondent computed tax increases of $245,051, $103,218, and $118,840, respectively, with respect to the returns of Crabtree Investments.

Bar and Package Store Sales

The following schedule summarizes the aggregate gross receipts of the package store and the bar as determined by the revenue agent:

| Description | 1992 | 1993 | 1994 |
|---|---|---|---|
| .50-liter | $147.00 | $255.50 | $87.50 |
| .200-liter | 6,938.70 | 3,158.08 | 2,177.72 |
| .375-liter | 7,224.40 | 4,361.77 | 2,716.54 |
| .750-liter | 14,019.70 | 7,478.99 | 7,497.29 |
| 1.5-liter wine | 178.80 | -0- | -0- |
| 1.75- & 2-liter | 3,623.70 | 3,133.14 | 749.40 |
| 3-liter | -0- | 39.96 | -0- |
| Miscellaneous | 745.20 | 2,240.70 | 3,247.20 |
| Liter--package | 11,670.40 | 5,778.84 | 6,257.29 |
| Liter--at bar | 669,067.89 | 169,498.45 | 160,480.14 |
| Beer | 278,624.08 | 265,500.00 | 342,458.00 |
|  | 992,239.87 | 461,445.43 | 525,671.08 |

The revenue agent reconstructed Crabtree Investments' gross receipts from bar and package store sales using the beer, wine, and liquor purchases as shown on the purchase orders provided to the agent by petitioners. The agent also used the drink and package store prices supplied by petitioners and applied a spillage or waste factor. The agent subtracted reported sales from total gross receipts,

as thus reconstructed, to arrive at the amount of unreported gross receipts.

The purchase orders provided to the agent by petitioners showed purchases of alcohol from six vendors. Two of the vendors sold beer, and the other four sold liquor. The revenue agent analyzed petitioners' purchase records and prepared a summary of the alcohol purchases according to bottle size and alcohol type. The revenue agent's audit workpapers summarize Crabtree Investments' purchase orders for liquor, beer, and wine as follows:

|                                  | Quantity Purchased | | |
| Items Purchased                  | 1992 | 1993 | 1994 |
| -------------------------------- | ---: | ---: | ---: |
| Liquor--.50-liter bottles        | 195 | 202 | 60 |
| Liquor--.200-liter bottles       | 2,698 | 999 | 588 |
| Liquor--.375-liter bottles       | 1,678 | 775 | 496 |
| Liquor--.750-liter bottles       | 1,404 | 634 | 571 |
| Wine--1.5-liter bottles          | 24 | -- | -- |
| Liquor--1.75 & 2-liter bottles   | 286 | 204 | 42 |
| Beer--12 oz., 16 oz., & wine cooler | 3,552 | -- | -- |
| Miscellaneous                    | 401 | 816 | 1,152 |
| Liquor--liter package            | 1,827 | 513 | 487 |
| Liquor--liter at bar             | 7,328 | 1,674 | 1,691 |
| Beer                             | 131,191 | 57,360 | 56,317 |
|                                  | 150,584 | 63,177 | 61,404 |

The original purchase orders from which the agent made the above summary were among the records that were lost in the December 1996 fire that destroyed Justins and are not included as part of the record in these cases.

The revenue agent used the bottle purchases reflected on the purchase orders provided by petitioners to reconstruct the total sales for each year.  Ms. Crabtree informed the revenue agent that 80 percent of the liter bottles purchased were used in the bar and 20 percent were sold in the package store.  The notices of deficiency issued to Crabtree Investments explain the computation of bar sales and package store sales as follows:

> Bar sales were determined based on using 80 percent of your purchases.  The number of unit purchases (bottles) times the number of servings per unit purchase times the charges per serving equals the bar sales.

> Package sales were determined based on using 20 percent of your purchases.  The number of unit purchases (bottles) times the unit sales price equals the package sales.

The allocation described in the above explanation applies only to liter bottles.  On the basis of the statements of petitioners, the agent treated all other bottles purchased by Crabtree Investments as having been sold in the package store.

Throughout the years in issue, the bar at Justins sold beer for $2 per bottle, draft beer in 10-ounce glasses for $2 per draft, and liquor for $3, $3.25, and $3.50 per drink, depending on the type of liquor used. Mixer liquors increased the drink price by 25 cents. Justins also sold liquor, wine, and beer from the package store.

Petitioners kept no record of the number of drinks given away and did not keep records of broken bottles or spilled drinks. During the initial audit interview, Mr. Crabtree informed the revenue agent that there was very little spillage of alcohol at the bar. In reconstructing bar sales of liquor, the agent used a 10-percent spillage or waste factor, and in reconstructing bar sales of draft beer the agent used a 5-percent spillage or waste factor.

During the initial audit interview, petitioners told the revenue agent that the drinks sold in the bar contained approximately 1 ounce of liquor. This is consistent with the practice of many other bars in the area. The revenue agent multiplied the number of liter bottles used in the bar by 33.8 in order to convert liters into ounces. After reducing the total volume in ounces by the 10-percent spillage or waste factor and assuming that each drink contained 1 ounce of liquor, the revenue agent determined the number of drinks available per bottle. She then

multiplied the number of drinks per bottle by the price charged per drink to obtain total liquor sales.

Ms. Crabtree told the revenue agent the prices charged for bottles of alcohol sold in the package store. The revenue agent multiplied the number of bottles sold in the package store by the price per bottle to determine total sales in the package store.

Income From Cover Charges

Respondent's agent computed income from cover charges of $91,000 for each of the years in issue. The notices of deficiency issued to Crabtree Investments provide the following explanation of the computation of this amount:

> Cover Charges were determined by using a $1
> charge for 52 Thursday nights per year times 250
> (the lounge capacity) and a $2 charge for 104
> (Friday and Saturday) nights per year times 375
> (1 1/2 times the lounge capacity) or $91,000.

This adjustment is based upon the information provided by Ms. Jerry Crabtree and Mr. Eddie Crabtree during their initial audit interviews with the agent.

Income From Food Sales

Respondent determined food sales from the bar to be $125 per week or $6,500 per year for each of the taxable years in issue. The notices of deficiency issued to

Crabtree Investments state as follows: "Food income was determined using $125 per week based on Florida Department of Revenue estimates for a business your size." Respondent used this estimate because Crabtree Investments did not provide any purchase records for the food sold in the bar.

Income From Cola, Juice, and Coffee Sales

Respondent determined that sales of nonalcoholic beverages, such as cola, juice, and coffee, were $19,435 per year for each of the years at issue. The notices of deficiency issued to Crabtree Investments provide the following explanation:

> Coke, Juice and Coffee sales were determined using an assumption that one quarter of the persons paying cover charges for nights when entertainment was provided [Thursday, Friday, and Saturday] would pay $1.50 for these items.

Income From Pay Telephone Receipts

Respondent determined pay telephone receipts to be $40 per week or $2,080 per year for each of the years in issue. The notices of deficiency issued to Crabtree Investments provide the following explanation: "Pay telephone income was determined using $40 per week based on Florida Department of Revenue estimates for a business your size." The revenue agent used this estimate because petitioners

did not produce any records or other evidence of pay telephone receipts.

Agents from two State taxing authorities audited Crabtree Investments during the years in issue. First, the Florida Department of Business Regulation, Division of Alcoholic Beverages and Tobacco (DABT), conducted a beverage surcharge tax audit for the period July 1990 through December 1993. The beverage surcharge tax is a tax on consumption of alcohol on the premises. As applied in these cases, the surcharge tax applies to bar sales but not to package store sales. Second, the Florida Department of Revenue conducted a sales tax audit for the period November 1989 through July 1995. The sales tax audit was initiated after a referral from the DABT.

OPINION

Unreported Income of Crabtree Investments

The first issue for decision is whether Crabtree Investments underreported its gross income for 1992, 1993, and 1994. Petitioners expressly concede the adjustments involving vending machine receipts and flower sales. The remaining adjustments at issue are: Bar sales, package store sales, income from cover charges, income from food sales, income from cola, juice, and coffee, and income from

the pay telephone.  Petitioners bear the burden of proving that respondent's determination is incorrect as to each of those adjustments.  See Rule 142(a).

Petitioners argue that respondent's use of the unit markup method of reconstructing income is improper because Crabtree Investments maintained detailed and adequate records.  Petitioners reason that, because its records were consistent with the information reported on its tax returns, we must accept the records as clearly reflecting its taxable income.  We disagree.

Taxpayers are required to keep adequate books or records from which their correct tax liability can be determined.  See sec. 6001.  The Commissioner may test the adequacy of a taxpayer's books and records by any reasonable method which, in the Commissioner's judgment, properly reflects taxpayer's taxable income.  See Holland v. United States, 348 U.S. 121, 131-132 (1954); Lipsitz v. Commissioner, 21 T.C. 917, 931 (1954), affd. 220 F.2d 871 (4th Cir. 1955).  If the Commissioner determines that a taxpayer's books and records are not adequate, then the Commissioner is entitled to reconstruct the taxpayer's income by any reasonable means.  See sec. 446(b); Webb v. Commissioner, 394 F.2d 366, 371-372 (5th Cir. 1968), affg. T.C. Memo. 1966-81.

We agree that respondent's use of the unit markup method is justified in the cases involving Crabtree Investments. The revenue agent found a material difference, approximately $400,000, between the aggregate deposits made into Crabtree Investments' account at First Union Bank and the gross receipts reported on its 1992 corporate tax return. According to the bank statements, aggregate deposits of approximately $800,000 were made into the account in 1992. Similarly, according to the 1992 general ledger of Crabtree Investments (with the exception of March deposits which could not be located) deposits totaled $789,449. On the other hand, Crabtree Investments reported sales of $479,829 on its 1992 corporate tax return. The revenue agent also found that Crabtree Investments did not maintain complete inventory records, and the agent noted a substantial drop in reported sales, from approximately $468,000 in 1992 to approximately $260,000 in 1993. Furthermore, despite the cash nature of the bar business, very little cash was deposited into the corporation's bank account. The daily records of the business showed bar sales equal to the total checks received with little or no cash.

In addition, two State taxing authorities noted the inadequacy of Crabtree Investments' records. First, the

DABT conducted a beverage surcharge tax audit for the period July 1990 through December 1993. The DABT auditor noted that Crabtree Investments did not keep very good records and kept only sketchy inventory records. The auditor used the wholesale distributors' reports (DABT Summary of Purchases) to determine the amount of alcohol Crabtree Investments purchased. The DABT Summary of Purchases is a listing of all items sold by alcohol distributors to a particular licensee. Florida law requires all wholesalers/distributors to report to the DABT all alcohol purchases by a licensee/retailer.

Second, the Florida Department of Revenue conducted a sales tax audit for the period November 1989 through July 1995. The sales tax auditor used an indirect method of reconstructing sales for taxable year 1993. She obtained the amount of alcohol purchased from the DABT Summary of Purchases and marked up the purchases to arrive at the selling price. The auditor found that for 1993 "there was a $325,000 difference between the sales that they reported to the Department of Revenue and the sales as they were marked up based on AB & T's numbers."

Petitioners gave the sales tax auditor deposit slips, weekly reports, and cash register tapes. The auditor found that the original records of Crabtree Investments were not

organized. Furthermore, the records were not complete. The auditor was unable to find journal tapes and the cash register tapes for the 3 sample months that she initially chose, and was forced to select different months. The report of the sales tax audit states that "the accounting records flow through to the financials without a hitch. However, the bar business is mostly cash and income is easily hidden from normal view." The auditor found that the deposit slips for the business show that deposits consisted mostly of checks. She found that to be unusual because bars are typically high cash businesses. The auditor noted in the audit report that "The taxpayer did not use due care in reporting all sales and deliberately hid income."

On the basis of the foregoing, we find that respondent was justified in using an indirect method of reconstructing income. The percentage or unit markup method is an acceptable method of reconstructing a taxpayer's income. See Langworthy v. Commissioner, T.C. Memo. 1998-218; Stewart v. Commissioner, T.C. Memo. 1990-264 (citing Tunningley v. Commissioner, 22 T.C. 1108 (1954); Stone v. Commissioner, 22 T.C. 893 (1954)).

Bar Sales

Petitioners attack respondent's reconstruction of bar sales on four grounds. First, petitioners assert that

> the revenue agent purportedly used the purchase
> records provided by Jerry Crabtree. However, the
> volume of alcohol used by the revenue agent in
> her analysis of reconstructing bar sales is
> inconsistent with the volume of alcohol actually
> purchased by the corporate taxpayer.

Petitioners argue that the revenue agent should have used the DABT Summary of Purchases as the starting point to reconstruct gross receipts from alcohol sales.

Petitioners claim that the DABT Summary of Purchases shows that Justins purchased 67,712 ounces of liquor (not including wine or beer) during 1992. Using petitioners' purchase orders, on the other hand, the revenue agent determined that Justins purchased 391,294.82 ounces of liquor during 1992. Petitioners assert that respondent's use of Crabtree Investments' purchase orders rather than the DABT Summary of Purchases results in an overstatement of 323,582.82 ounces in liquor purchases. Petitioners do not reconcile this difference or explain why their purchase records reflect purchases that are so much greater than those reflected in the DABT Summary of Purchases.

Despite the large difference in ounces of liquor purchased, petitioners' accountant presented this comparison for the first time at trial. Furthermore, petitioners' argument is based solely on taxable year 1992. At trial, petitioners' accountant testified that he had made a similar analysis for 1993, but petitioners did not seek to introduce the accountant's 1993 analysis into evidence. In their opening brief, petitioners assert: "Although the DABT audit was not extended beyond 1993, the 1992 comparison of alcohol purchases testified to by the Petitioners' accountant indicates that the revenue agent's calculation of unreported income is unreliable." Thus, it appears that petitioners are implicitly arguing that the revenue agent overstated the amount of alcohol purchased in 1993 and 1994, as well as in 1992.

Furthermore, petitioners have shown no reason to believe that the DABT Summary of Purchases would yield a more accurate amount of alcohol purchased than petitioners' own purchase records. In fact, the opposite appears to be the case. If we take the total dollar amount of liquor purchases during 1992 from Crabtree Investments' general ledger and the gallonage of liquor purchased in 1992 by Justins as reported in the DABT Summary of Purchases, the

average monthly price of liquor purchased for 1992 is approximately $146.13 per gallon.

Second, petitioners contend that respondent erred in assuming that drinks contained 1 ounce of alcohol. The revenue agent testified that petitioners told her at the initial audit interview that all drinks contained 1 ounce of liquor. At trial, Mr. Crabtree testified that he did not recall making that statement to the revenue agent and testified that a 3-ounce drink was common. In addition, petitioners offered the testimony of three bartenders at Justins to rebut the 1-ounce assumption. The first bartender testified that drinks contained between 3 and 7 ounces of liquor. A second bartender testified that drink size varied between 2 and 4 ounces. A third bartender, who was not employed at Justins during the years in issue, testified that she poured drinks containing between 2 and 3 ounces of liquor. On the basis of the entire record, we find that respondent's assumption that each drink contained 1 ounce of alcohol, which was based on petitioner's statement to the agent, is reasonable and that petitioners have shown no reason for the Court to find otherwise.

Third, petitioners argue that respondent's reconstruction of bar sales does not take into account drink specials offered by Justins during the years in issue.

Petitioners claim that between 1992 and 1994 Justins offered two-for-one drink specials during a happy hour which lasted from the opening of the bar until approximately 9 p.m. when the band began to play. Petitioners also claim that Justins held Ladies' Nights during which female customers received free drinks or drinks at a reduced price. We find that the record is devoid of any evidence from which we can find the number of promotion drinks during the years in issue. In fact, there is evidence that Justins offered no drink specials. The DABT Preaudit Questionnaire completed by Ms. Crabtree contains the following question: "Do you have any promotions such as, buy one get one free or all you can drink specials?" Ms. Crabtree answered: "No".

Finally, petitioners argue that respondent's recomputation is incorrect because it fails to take into account losses due to employee theft during the years in issue. However, the record is devoid of any evidence of employee theft, except for the biased and unpersuasive testimony of Mr. Eddie Crabtree. Thus, petitioners have failed to satisfy their burden of proof on this issue. See Rule 142(a).

Income From Cover Charges

Petitioners attack respondent's reconstruction of income from cover charges as arbitrary upon four grounds. First, petitioners argue that respondent erred by assuming that a $1 cover charge was collected on Thursday nights. Second, petitioners assert that respondent's assumption that the number of customers paying cover charges was equal to capacity on Thursdays and equal to 1-1/2 capacity on Fridays and Saturdays is false. Third, petitioners argue that the revenue agent failed to take into account the hours on Friday and Saturday nights during which cover charges were not collected. Finally, petitioners claim that in respondent's determination of unreported income respondent failed to give them credit for the cover charge revenue reported on Crabtree Investments' tax returns.

As to petitioners' first contention, we note that respondent's computation is based upon the admission made by the individual petitioners during their initial audit interview with the revenue agent to the effect that they collected cover charges of $1 per customer on Thursday nights. As to petitioners' second and third contentions, attacking respondent's assumptions that 250 customers paid $1 each on Thursdays and 375 customers paid $2 each on Fridays and Saturdays, petitioners' contentions are based

principally upon the biased testimony of Mr. Eddie Crabtree. We find no credible evidence to support petitioners' argument that respondent's determination is wrong. In this regard, we accord no probative weight to the testimony of petitioners' witnesses.

As to petitioners' final contention that respondent failed to give them credit for the cover charges reported on their returns for the years in issue, petitioners are wrong. Respondent's determination of the unreported income of Crabtree Investments gives petitioners full credit for the gross receipts or sales reported on each of the returns in issue. Thus, any cover charges reported by petitioners have been subtracted from the adjustment computed by respondent for each of the subject years. Accordingly, we find that petitioners have failed to prove that respondent's reconstruction of income from cover charges is incorrect. See Rule 142(a).

Income From Food Sales

Petitioners argue that respondent's estimate of food sales is unreliable and arbitrary. Petitioners assert that the revenue agent could have reviewed Crabtree Investments' general ledgers to determine the actual amount of food purchases because food was purchased by check. Petitioners

bear the burden of proving respondent's determination wrong.  See id.

We find that petitioners have failed to meet their burden of proof for the following reasons.  First, petitioners have failed to produce any records of food sales that refute respondent's determination.  Second, petitioners have failed to produce any records of food purchases from which the amount of food sales could be determined, nor have they shown how that amount could be determined from the general ledgers.  Third, the record does not support petitioners' assertion that food was purchased entirely by check.  To the contrary, the Florida sales tax auditor noted in her audit report that "The taxpayer pays liquor bills, snack bills, and petty cash items in cash."

Income From Cola, Juice, and Coffee Sales

Petitioners argue that the reconstruction of nonalcoholic beverage sales is unreliable and arbitrary.  Petitioners assert that few bar customers ordered nonalcoholic beverages during the years in issue, and that nonalcoholic beverages were often served to customers without charge.  Petitioners have failed to produce any evidence of sales of nonalcoholic beverages to refute

respondent's determination, other than their own biased testimony.  Accordingly, we sustain respondent's determination.  See Rule 142(a).

Income From Pay Telephone Receipts

Petitioners argue that respondent's estimate of pay telephone receipts is unreliable and arbitrary. Petitioners claim that respondent should have subpoenaed the telephone records to determine the actual amount of money received.  However, petitioners have failed to produce any telephone records that would refute respondent's estimate.  Accordingly, petitioners have not satisfied their burden of proving respondent's determination wrong.  See id.  On the basis of our review of the record, we find that petitioners failed to meet their burden of proof as to each category of income that respondent's determination comprises.  Accordingly, we sustain respondent's determination that Crabtree Investments underreported its gross income in each of the taxable years in issue.

Deficiencies

The second issue for decision is whether one-half of the unreported income of Crabtree Investments for each of the years in issue is a constructive dividend to each of

its shareholders.  The notice of deficiency issued to petitioner Jerry Crabtree contains the following explanation:

> It is determined that, for the years ended December 31, 1992, 1993, and 1994, you received dividends from the corporation, Crabtree Investments, in the amount of $320,847, $162,737, and $210,946, respectively.
>
> Accordingly, your taxable income for the years ended December 31, 1992, 1993, and 1994, is increased in the amounts of $320,847, $162,737, and $210,946, respectively.

The notice of deficiency issued to petitioner Eddie Crabtree contains a similar explanation.  Petitioners bear the burden of proving respondent's determination wrong.  See id.

Section 61(a) defines gross income as "all income from whatever source derived," including gross income derived from dividends.  See sec. 61(a)(7).  Dividends may be formally declared or they may be constructive.  See Noble v. Commissioner, 368 F.2d 439, 442 (9th Cir. 1966), affg. T.C. Memo. 1965-84; Commissioner v. Makransky, 321 F.2d 598, 601 (3d Cir. 1963), affg. 36 T.C. 446 (1961); Sachs v. Commissioner, 277 F.2d 879, 882 (8th Cir. 1960), affg. 32 T.C. 815 (1959).  The determination of whether a constructive dividend was received is a question that

depends on the facts of each case.  See <u>Hardin v. United States</u>, 461 F.2d 865, 872 (5th Cir. 1972).

In these cases, respondent argues that, as the sole and controlling shareholders of Crabtree Investments, petitioners "exercised the requisite substantial influence to be taxable on these amounts."  Petitioners' only argument is that they could not have received constructive dividends from Crabtree Investments because the corporation did not receive the unreported income determined by respondent.

As discussed earlier in this opinion, we find that Crabtree Investments received unreported income during 1992, 1993, and 1994 in the amounts determined by respondent.  Thus, we reject the sole argument that Ms. Jerry Crabtree and Mr. Eddie Crabtree did not receive constructive dividends from Crabtree Investments because the corporation had not received any unreported income.  Accordingly, we sustain respondent's determination that Ms. Jerry Crabtree and Mr. Eddie Crabtree received dividends in the amounts set forth in the subject notices of deficiency.

Fraud Penalty

The third issue for decision is whether petitioners are liable for the fraud penalty under section 6663(a) for each of the years in issue. Respondent determined that petitioner Crabtree Investments fraudulently omitted income from its 1992, 1993, and 1994 returns on which there are underpayments of $245,051, $103,218, and $118,840, respectively. Accordingly, respondent determined that Crabtree Investments is liable for civil fraud penalties under section 6663 of $183,788, $77,414, and $89,130.

Respondent determined that petitioner Jerry Crabtree fraudulently omitted income from her 1992, 1993, and 1994 returns on which there are underpayments of $97,728, $49,310, and $76,554, respectively. Accordingly, respondent determined that Ms. Jerry Crabtree is liable for civil fraud penalties under section 6663 of $73,296, $36,983, and $57,416.

Respondent further determined that petitioner Eddie Crabtree fraudulently omitted income from his 1992, 1993, and 1994 returns on which there are underpayments of $99,346, $50,523, and $95,103, respectively. Accordingly, respondent determined that Mr. Eddie Crabtree is liable for civil fraud penalties under section 6663 of $74,510, $37,892, and $71,327.

Section 6663(a) provides that, if any part of an underpayment is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud. The Commissioner bears the burden of proving by clear and convincing evidence that: (1) An underpayment exists; and (2) some portion of the underpayment is attributable to fraud. See sec. 7454(a); Rule 142(b); DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992). The term "underpayment" is defined in section 6664(a) as "the amount by which any tax imposed by this title exceeds the excess of (1) the sum of (A) the amount shown as the tax by the taxpayer on his return, plus (B) amounts not so shown previously assessed (or collected without assessment), over (2) the amount of rebates made." The Commissioner must establish that the taxpayer is guilty of fraud with respect to his or her return for each taxable year. E.g., Otsuki v. Commissioner, 53 T.C. 96, 105 (1969); AJF Transp. Consultants, Inc. v. Commissioner, T.C. Memo. 1999-16. If the Commissioner establishes that any portion of the underpayment is attributable to fraud, then the entire underpayment is treated as attributable to fraud, unless the taxpayer establishes by a preponderance

of the evidence that it is not attributable to fraud. See sec. 6663(b).

In a case like the present cases in which allegations of fraud are intertwined with unreported and indirectly reconstructed income, the Commissioner may prove the first prong of the fraud test, that an underpayment exists, in one of two ways: (1) By proving a likely source of the unreported income; or (2) where the taxpayer alleges a nontaxable source, by disproving the nontaxable source so alleged. See Parks v. Commissioner, 94 T.C. 654, 661 (1990).

To prove the second prong of the fraud test, fraudulent intent, the Commissioner must show that the taxpayer intended to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax. See Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. See DiLeo v. Commissioner, supra at 874; Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be imputed or presumed but must be affirmatively

established by clear and convincing evidence.  See <u>Beaver</u> <u>v. Commissioner</u>, 55 T.C. 85, 92 (1970).

Because direct proof of a taxpayer's fraudulent intent is rarely available, fraud may be shown by circumstantial evidence.  See <u>Stephenson v. Commissioner</u>, 79 T.C. 995, 1005-1006 (1982), affd. per curiam 748 F.2d 331 (6th Cir. 1984).  A taxpayer's entire course of conduct may establish the requisite fraudulent intent.  See <u>Stone v. Commissioner</u>, 56 T.C. 213, 224 (1971); <u>Otsuki v. Commissioner</u>, <u>supra</u> at 105-106.

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent.  These badges of fraud include:  (1) Understating income, see <u>Holland v. United States</u>, 348 U.S. at 137; <u>Parks v. Commissioner</u>, 94 T.C. at 664; (2) inadequate books and records, see <u>Merritt v. Commissioner</u>, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172; (3) false entries on or alterations of documents, see <u>Spies v. Commissioner</u>, 317 U.S. 492, 499 (1943); (4) failure to file tax returns, see <u>id.</u>; (5) implausible or inconsistent explanations of behavior, see <u>Grosshandler v. Commissioner</u>, 75 T.C. 1, 20 (1980); (6) concealment of income or assets, see <u>Bradford v. Commissioner</u>, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; (7) dealing in cash; and

(8) failure to cooperate with tax authorities, see <u>id.</u> at 307-308.

A corporation can act only through its officers. See <u>Federbush v. Commissioner</u>, 34 T.C. 740, 749 (1960), affd. per curiam 325 F.2d 1 (2d Cir. 1963). "Corporate fraud necessarily depends upon the fraudulent intent of the corporate officer." <u>Id.</u> (citing <u>Auerbach Shoe Co. v. Commissioner</u>, 216 F.2d 693 (1st Cir. 1954), affg. 21 T.C. 191 (1953)). In these cases, the individual petitioners each own 50 percent of the stock of Crabtree Investments. They serve as the only two officers of the corporation. On the basis of the entire record, we think the individual petitioners exercised sufficient control over the affairs of Crabtree Investments to justify imputing their actions to Crabtree Investments. See <u>Auerbach Shoe Co. v. Commissioner</u>, <u>supra</u> at 697.

As to the fraudulent intent prong of the fraud analysis, respondent asserts that the following items of circumstantial evidence indicate fraud: (1) Understatement of income; (2) inadequate records; (3) implausible explanations of the unreported income; (4) petitioners' decision to rebuild the business after the fire destroyed it; and (5) petitioners' failure to report a robbery at gunpoint due to their fear of an IRS audit.

As discussed above, we found that Crabtree Investments, Ms. Jerry Crabtree, and Mr. Eddie Crabtree each understated income in 1992, 1993, and 1994. We agree that a large understatement may, in an appropriate case, suggest fraudulent intent. In cases such as those in issue, in which deficiencies were determined using an indirect method of proof and sustained on the basis of petitioners' failure to disprove such determinations, the existence of underpayments, standing alone, is insufficient to support a finding of fraud. See Kashat v. Commissioner, 229 F.2d 282, 285 (6th Cir. 1956), revg. a Memorandum Opinion of this Court dated March 29, 1954; Drieborg v. Commissioner, 225 F.2d 216, 218 (6th Cir. 1955) affg. in part and revg. in part a Memorandum Opinion of this Court dated February 24, 1954); Otsuki v. Commissioner, 53 T.C. 96 (1969); Christensen v. Commissioner, T.C. Memo. 1982-672; cf. Mazzoni v. Commissioner, T.C. Memo. 1970-37 (refusing to pile "inference upon inference" by basing fraud exclusively on unreported income established by the net worth method of reconstructing income), affd. 451 F.2d 197 (3d Cir. 1971). This is particularly true in cases such as these where there is no evidence that the taxpayers actually received any of the unreported income computed using an indirect method.

As to the second badge of fraud asserted by respondent, that petitioners maintained inadequate records, we note that respondent has advanced this argument only with respect to the records of Crabtree Investments. Respondent has not introduced any evidence that petitioners Jerry and Eddie Crabtree themselves maintained inadequate records. As to the records of Crabtree Investments, we cannot review their adequacy or inadequacy because all of the records, except for the general ledgers, were destroyed by fire. Therefore, we have no independent means from which to evaluate the revenue agent's conclusion that the records were inadequate.

As to the third badge of fraud, respondent argues that it is "patently unreasonable, particularly considering the [cash] nature of his business" for the bar to earn income "which just happened to equal the amount of checks received for days upon end." Petitioners claim that, during the years in issue, some large manufacturing companies in the area were renovating their plants and employed a number of out-of-town workers. Petitioners testified that Justins provided check-cashing services to these people to entice them to spend their money at Justins.

Partly on the basis of the testimony of their accountant, petitioners maintain that from time to time

they would withdraw cash from their personal savings account at AmSouth and would use the money at Justins to cash customers' payroll checks.  Petitioners would deposit the customers' paychecks into Crabtree Investments' business account at First Union, write a check for cash in that amount, and start the process at Justins over again. Eventually, they would redeposit the original amount of money into their personal savings account at AmSouth.

As mentioned above, virtually all of Crabtree Investments' original records were destroyed by fire.  As a result, we cannot fully evaluate petitioners' assertion that they used cash from their personal accounts in the bar.  Our analysis of the statements from petitioners' individual checking accounts tends to support petitioners' explanation.  Furthermore, the bank account statements suggest that the individual petitioners were losing money during the years in issue.  In 1994, they deposited the "surrender proceeds" from shares in "The Growth Fund" in the aggregate amount of $41,584.87, and Mr. Eddie Crabtree deposited a check for $25,790.65, apparently the proceeds from the sale of real property.  Nevertheless, during the years in issue, the balance in the account went from $82,284.35 to $9,274.19.  Respondent does not assert that the withdrawals from the joint bank accounts increased the

net worth of the individual petitioners, such as through the purchase of other assets.  On the basis of the fact that we have insufficient evidence by which to evaluate respondent's assertion and the fact that there is evidence in the record that tends to support petitioners' assertion, we cannot accept respondent's position that petitioners' explanation of the lack of cash deposits is "patently unreasonable".

Respondent next asserts that petitioners' decision to rebuild the business after the fire supports respondent's determination of fraud.  Respondent argues that petitioners would not have rebuilt an uninsured building if the business had been unprofitable.  Petitioners maintain that the business was losing money.  Mr. Eddie Crabtree testified that petitioners did not recover from the insurance company because the insurance company filed for bankruptcy during the same week that Justins burned. Mr. Eddie Crabtree further testified that he consulted a commercial real estate agent who recommended that it would be easier to sell the property with a structure on it than as bare land.  We accept petitioners' explanation for their decision to rebuild after the fire.  We do not agree with respondent that it is an indication of fraud.

Finally, respondent asserts that petitioners' explanation of their refusal to report a robbery indicates fraud on their part. Mr. Eddie Crabtree testified that his brother was robbed at gunpoint of approximately $15,000. Mr. Eddie Crabtree further testified that Mr. Morton, petitioners' accountant, "was afraid to report it because the IRS would say--would throw up a yellow flag or red flag." Respondent argues on brief that "the evidence indicates petitioners had every right to fear an audit given the fraudulent nature of the returns in issue." We do not agree with respondent that petitioners' failure to report the alleged robbery, based upon the recommendation of their accountant, supports a finding of petitioners' fraud.

On the basis of the entire record, we find that respondent has not met his burden of proving that any part of the underpayment of tax in these cases is due to fraud. Accordingly, we do not sustain respondent's determination that Crabtree Investments, Ms. Jerry Crabtree, and Mr. Eddie Crabtree are liable for the fraud penalty under section 6663(a).

Penalty for Negligence or Disregard of Rules or Regulations

Because we find that petitioners are not liable for the fraud penalty under section 6663(a), we must consider whether they are liable for the accuracy-related penalty under section 6662(a) for 1992, 1993, and 1994, which respondent determined as an alternative to fraud. Section 6662 imposes a penalty equal to 20 percent of any portion of an underpayment of tax that is attributable to negligence or disregard of rules or regulations. See sec. 6662(a) and (b). The term "negligence" is defined as "any failure to make a reasonable attempt to comply with the provisions of [title 26 of the United States Code]". Sec. 6662(c). This includes any failure to exercise due care or to do what a reasonable and ordinarily prudent person would do under the circumstances. See Rybak v. Commissioner, 91 T.C. 524, 565 (1988); Neely v. Commissioner, 85 T.C. 934, 947 (1985). The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c). Petitioners bear the burden of proving that respondent's determination of negligence is erroneous. See Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

Petitioners contend that they maintained adequate and accurate accounting records.  Petitioners assert that Crabtree Investments did not intentionally or unintentionally understate its income from sales during the audit period.  They also argue that "any understatement of tax as a result of the adjustments made at trial is insubstantial and not due to any negligence or intentional disregard of rules or regulations."  On the basis of the entire record of these cases, we find that petitioners have not met their burden of proving that the underpayment of tax is not attributable to negligence or disregard of rules or regulations.  Accordingly, we hereby sustain respondent's determination that petitioners are liable for the accuracy-related penalty under section 6662(a) for the years in issue.

To reflect the foregoing and concessions by the parties,

Decisions will be entered
under Rule 155.