2013 VT 62

# Travia's Inc. and Robert and Jill Mellion v. State of Vermont, Department of Taxes

[86 A.3d 394]

No. 12-422

Present: **Reiber, C.J., Dooley, Skoglund and Burgess, JJ. and Toor, Supr. J., Specially Assigned**

Opinion Filed August 9, 2013

Motion for Reargument Denied September 19, 2013

*Erin Miller Heins* of *Langrock Sperry & Wool, LLP*, Burlington, for Plaintiffs-Appellants.

*William H. Sorrell*, Attorney General, and *Danforth Cardozo, III*, Assistant Attorney General, Montpelier, for Defendant-Appellee.

¶ 1. **Skoglund, J.** Taxpayers are owners and operators of an S-corporation known as Travia's Inc., a small bar and grill in Hinesburg, Vermont. They appealed the Department of Taxes' (DOT) assessment of meals tax and alcoholic beverage tax for the audit years 2006, 2007, and 2008, and corporate income and personal income tax for the audit years 2005, 2006, and 2007. Following a hearing at the Department, the Commissioner of Taxes affirmed the Department's assessments. Pursuant to 32 V.S.A. § 9275, taxpayers appealed the Commissioner's determination to the civil division, which affirmed the assessment against Travia's of additional alcohol, meals, and income tax. Taxpayers now challenge the assessment before this Court. We affirm.

¶ 2. As found by the trial court, Travia's Inc., is an S-corporation, so the bulk of its income and losses pass through to its shareholders for reporting on their personal income tax returns. Mr. Mellion owns 100 percent of Travia's shares and asserts that he is the sole operator of the business, preparing and serving all meals and alcohol. Mrs. Mellion, the secretary of the corporation, maintains the books for the business. Travia's has no other employees. In early 2009, DOT initiated an audit of Travia's corporate income tax records for tax years 2005, 2006, 2007, and 2008. An experienced DOT auditor conducted the audit.

¶ 3. The auditor discovered several issues that required further investigation. First, Travia's cost-of-goods (COG) to gross receipts ratio was approximately fifty-six percent, an abnormally high percentage, more than double the industry average for the bar and restaurant business. Typically, the COG ratio for restaurants is between twenty-eight and thirty-two percent, and the COG ratio for bars is sixteen to twenty-four percent. According to the Department, a high cost-of-goods ratio sometimes indicates over-stated costs or understated income. Also of concern, Travia's listed $500 worth of inventory each year, suggesting that the business had no inventory accounting controls in place.

¶ 4. As a result of the preliminary examination, the Department had the auditor conduct an on-site audit of Travia's. Travia's has a single cash register, which produces two types of paper tapes. One is a "running tape," which records each sale as it is rung in, and the other is a "Z tape," which can be produced at the end of the day and shows a summary of that day's sales. Travia's Z tapes summarize total sales of liquor including tax, and food not including tax. Mr. Mellion testified that he produces a Z tape showing the daily totals and puts it in an envelope at the end of each day and writes the daily totals of food and alcohol sales on the envelope. Mrs. Mellion then transfers the amounts written on the envelope to a weekly summary of sales, one page per week.

¶ 5. The auditor testified that he looked at three running tapes. The running tapes were in large rolls, not dated or labeled, and the ink was too faded to read on the three he examined. He also looked at a sample of seven weekly envelopes and the forty-two Z tapes inside those envelopes. The auditor found that the totals on the Z tapes did not always match the totals recorded on the envelopes. There were handwritten adjustments on the Z tapes where some numbers were crossed out and others written in. Of the forty-two Z tapes examined, fourteen of them showed different totals than the corresponding totals noted on the envelopes. On eight of the fourteen tapes with discrepancies, the Z tape total and the envelope total differed by multiples of $100. When asked about these discrepancies, Mr. Mellion told the auditor that the cash register had problems throughout the three-year audit period and did not produce accurate Z tapes, that he would put down his recollection of the day's total rather than what the tapes said, and that what he wrote on the envelopes was accurate. He further testified that he ignored the Z tapes and instead wrote the running tape totals on the weekly envelopes. However, of the running tapes for the fourteen dates examined, only four matched what was written on the envelope.

¶ 6. Taxpayers met with DOT staff and complained about the initial assessments. They tried to convince the Department to use the running tapes and Z tapes, along with weekly summary sheets. The Department declined to use the records provided, finding that Travia's hand-altered records did not match what Travia's reported on its meals tax returns and that taxpayers could not adequately explain the conflicting information on the running tapes, Z tapes, handwritten alterations, envelopes, and

summary sheets. The Department determined that further investigation was necessary.

¶ 7. After concluding that the running tapes and the Z tapes were too unreliable to serve as a basis for the audit, the auditor chose to estimate Travia's income using other information and an alternative method to recalculate the assessment. As noted above, Travia's cost-of-goods to gross receipts ratio was approximately fifty-six percent, combining the ratio for food and drink. The average COG ratio for restaurant food is twenty-eight to thirty-two percent and for alcoholic beverages is sixteen to twenty-four percent. Travia's showed a ratio of seventy-two percent for food and forty percent for alcohol. The auditor could find "no logical explanation" for the high ratios and investigated further.

¶ 8. Using industry averages of goods sold and drink sizes, the auditor calculated what Travia's COG ratio would be based on the income recalculated for Travia's alcohol purchase records. He obtained actual sales records from Travia's beverage vendors and attempted to reconstruct Travia's income using a routine audit procedure. He considered the average price of Travia's drinks as stated by taxpayers and the average costs of alcoholic drinks based on a review of Travia's vendor invoices, and calculated a COG ratio for beer, for wine, and for liquor. He used a weighted average of these three ratios and determined the COG ratio for all alcohol would be twenty-seven percent. The auditor then applied a food ratio of fifty percent, based on industry ranges and taking into account Mr. Mellion's assertions that he purchased all the food at retail. Combining the twenty-seven percent and the fifty percent gave an overall COG ratio of thirty-eight and one-half percent, which the auditor rounded up in the taxpayer's favor to forty percent. Based on these estimates, the auditor assessed an additional meals tax of $2,673.29, an additional alcohol tax of $11,388.23, and an additional personal income tax for the taxpayers of $7,290.03, plus interest and penalties.

¶ 9. At the hearing before the Department, taxpayers did not dispute that they are officers of the Travia's corporation and therefore responsible for Travia's meals and alcoholic beverage taxes. They also agreed that they filed their tax returns based on their register tapes and weekly envelope totals. They further agreed that if there is a valid adjustment to those taxes owed by Travia's, there is a valid corresponding adjustment to their personal income taxes.

¶ 10. The Commissioner of Taxes approved the holding of the hearing officer and assessed the taxes as determined by the Department. The total revised assessment was $26,254.30 for alcoholic-beverage tax, $6,186.45 for meals tax, and $20,016.00 for personal income tax.[1] The taxpayers appealed the new assessments.

¶ 11. On appeal, taxpayers raise the same issues as presented to the Department. They assert that DOT had no authority to look beyond their business records for a calculation of their tax liabilities, and that even if DOT was authorized to look beyond their business records, DOT's computation is incorrect.

¶ 12. Where there is an intermediate level of appeal from an administrative body, this Court reviews the case under the same standard as applied in the intermediate appeal. *Tarrant v. Dep't of Taxes*, 169 Vt. 189, 195, 733 A.2d 733, 738 (1999). We review the Commissioner's decision independent of the superior court's findings and conclusions. See *Devers-Scott v. Office of Prof'l Regulation*, 2007 VT 4, ¶ 4, 181 Vt. 248, 918 A.2d 230. The Commissioner's findings will not be set aside unless clearly erroneous. *Morton Bldgs., Inc. v. Dep't of Taxes*, 167 Vt. 371, 374, 705 A.2d 1384, 1386 (1997). It is the taxpayer's burden to show that the assessment is erroneous, *In re DeCato Bros., Inc.*, 149 Vt. 493, 496, 546 A.2d 1354, 1356 (1988), and that showing must be "clear and convincing." *In re Williston Inn Grp.*, 2008 VT 47, ¶ 11, 183 Vt. 621, 949 A.2d 1073 (mem.).

¶ 13. ▪ Taxpayers claim that the only authority for the Commissioner to "estimate" taxes is found in 32 V.S.A. § 9273(a) and that section applies only when a taxpayer has failed to make a return.[2] However, § 9273(b) clearly allows for the Commissioner to "examine[ ]" a return after it is filed and to "make such further audits or investigation as he or she may deem necessary." Further, it provides that if the Commissioner determines that there is a deficiency with respect to the payment of any tax due

---

[1] Because the Department did not have the 2005 vendor records for Travia's purchases, it used an average of the COG from the years for which the Department had vendor records to come up with an estimated COG for the 2005 income tax calculation.

[2] "If any operator shall fail to make a return as herein required, the commissioner may make an estimate of the tax liability of the operator from any information he or she may obtain, and according to such estimate . . . , assess the taxes, interest and penalty due the state from such person, give notice of such assessment to the person and make demand upon him or her for payment." 32 V.S.A. § 9273(a).

under the chapter, "he or she shall assess the taxes and interest due the state." *Id.* Where, as here, the source documents used to prepare returns suggest inaccuracies, it follows that the returns filed are not "as . . . required," and the Commissioner may proceed to make an investigation and estimation of tax, just as if no returns had been filed at all. *Id.* § 9273(a).

¶ 14. In *Korba v. New York State Tax Commission*, 444 N.Y.S.2d 312, 314 (App. Div. 1981), *appeal denied*, 435 N.E.2d 1099 (N.Y. 1982), the court held that, where restaurant records "were unreliable and inaccurate" the use of "external indices to determine the tax due was . . . appropriate." That is what occurred in this case. The Commissioner found that the taxpayers' records were "not just confusing, contradictory, and inexplicably altered, they were incomplete." The Commissioner's findings on this point are supported by substantial evidence in the record. Mr. Mellion altered the cash register tapes to show lower sales without adequate or logical explanation. While taxpayers argue that the Department could have and should have conducted its audit from the register's running register tapes showing every individual transaction during the entire audit period, the hearing officer conducted a thorough review of taxpayers' records, including some of the longer running tapes, and found that they did not provide support for the handwritten changes made by the taxpayers and likewise contained discrepancies. The discrepancies found by the Commissioner, with only one exception, lowered the total receipts amount. Eight of the fourteen Z tapes with variances are at or close to $100 increments. Other irregularities were present.

¶ 15. ▇ Taxpayers also try to support their argument by citing cases from other jurisdictions. The cited cases are inapposite. For example, in *Christ Cella, Inc. v. State Tax Commission*, 477 N.Y.S.2d 858 (App. Div. 1984), the court held that the taxing authority "may not use such external indices unless it is virtually impossible to verify taxable sales receipts and conduct a complete audit with available records." *Id.* at 859 (quotation omitted). And, in *In re L.G.J. Restaurant, Inc.*, 27 B.R. 455, 459 (Bankr. E.D.N.Y. 1983), where the state's tax auditor ignored and made no effort to examine L.G.J.'s cash register tapes, the bankruptcy court held that "where there is no insufficiency of record keeping, the taxing authority's resort to projected tax estimates . . . inherently lacks a rational basis and is per se arbitrary and capricious." Here, the recordkeeping was significantly muddled

and insufficient, and the Commissioner found it impossible to verify the sales receipts presented and to complete an audit based on the available records. It was therefore appropriate for the Commissioner to undertake an investigation and audit to produce an assessment that made sense.

¶ 16. Taxpayers also argue that, even if the Department had authority to estimate Travia's income from external sources, its estimate of Travia's income was based on inaccurate information and, therefore, is clearly erroneous and must be overturned. Specifically, they claim the estimation methodology used by DOT required the auditor to input variables such as price and drink size into a formula to determine the amount of income derived from every bottle of liquor, wine, and beer, and that it resulted in a drastic distortion of beverage sales.

¶ 17. ▮ It is true that neither the auditor nor the hearing officer credited Mr. Mellion's testimony that his average pour is four ounces of liquor and eight ounces of wine, that liquor drink prices averaged $4.00, and that the average price for a glass of wine was $5.00. Taxpayers also dispute the vendor records used as third-party-source data and the assessment of income from meals sales, claiming the hearing officer ignored Mr. Mellion's testimony. The auditor, a field examiner for the Department for seventeen years with experience as a bar manager, testified that he has never seen a four-ounce drink size and that the average pour of a liquor drink is one and a half ounces. That the hearing officer did not accept Mr. Mellion's testimony (or factor in a "spillage" allowance for beer that Travia's sells only in bottles) does not meet taxpayer's burden to show the findings of fact were clearly erroneous. See *Morton*, 167 Vt. at 374, 705 A.2d at 1386.[3] The hearing officer heard conflicting testimony and, for the most part, credited the Department's evidence of prices, sizes, and calculations. That is the province of the factfinder. *Rock v. Dep't of Taxes*, 170 Vt. 1, 11, 742 A.2d 1211, 1219 (1999). We find no basis to disturb the findings.

¶ 18. ▮ ▮ Using the vendor records of Travia's alcohol purchases and allowing Travia's own records of food purchases,

---

[3] There was a further hurdle to understanding Travia's record of income for the sale of its drinks. Travia's reportedly sold its alcoholic beverages with the tax included in the price, but posted no notice to that effect on the premises as required.

the auditor applied a commonly accepted method of reconstructing Travia's gross receipts, and from that he computed Travia's meals and rooms tax and taxpayers' income tax liability. According to the Commissioner, this method of reconstructing Travia's gross receipts is commonly accepted and is used routinely by the Internal Revenue Service. See, e.g., *Cebollero v. Comm'r of Internal Revenue*, 967 F.2d 986 (4th Cir. 1992); *Webb v. Comm'r of Internal Revenue*, 25 T.C.M. (CCH) 454 (1966). There was no evidence to the contrary. We accord substantial deference to matters within the agency's area of expertise, and absent a clear and convincing showing to the contrary, a methodology chosen through that expertise is presumed correct, valid and reasonable. *Town of Killington v. Dep't of Taxes*, 2003 VT 88, ¶ 5, 176 Vt. 70, 838 A.2d 91. Taxpayers have not shown by clear and convincing evidence that the method was arbitrary or invalid.

¶ 19. ▮▮ ▮▮ Taxpayers had a duty to maintain reliable records. Vermont's meals and alcoholic beverage taxes are remitted to the State through a self-reporting system. The system relies on operators to calculate and collect the proper amount of tax from their customers and to remit all tax collected to the state. 32 V.S.A. § 9241 (imposition of tax); *id.* § 9242 (collection of tax); *id.* § 9243 (filing returns and payment). Taxpayers are required to keep "the books of account ordinarily maintained by the average prudent businessman" under the Vermont Meals and Rooms Tax Regulations § 1.9203-1(a), 1 Code of Vt. Rules 10 060 023-7. Courts have routinely recognized the obligation of taxpayers to maintain reliable records that are adequate to enable a tax auditor to make a reasonable determination of the amount of tax due. *Hogg v. United States*, 428 F.2d 274, 282 (6th Cir. 1970). Taxpayers failed to meet these obligations. The source material used to prepare Travia's meals and alcohol tax returns was unreliable and did not satisfy the regulation. The tapes were manually altered by taxpayers who claimed that the cash register was broken for the entire three-year audit period. See *Alexandre v. Comm'r of Revenue Servs.*, 22 A.3d 518, 527-28 (Conn. 2011) (holding that Z tapes which lack detail of individual transactions do not satisfy a bar/restaurant's record keeping responsibilities for tax audit purposes); *Rodriguez v. Tax Appeals Tribunal of State*, 918 N.Y.S.2d 625, 627 (App. Div. 2011) (concluding that in absence of cash register tapes showing transactions, testimony that owner "rou-

tinely tracked the daily sales activities of the business in his head" insufficient (quotation and alteration omitted)).

¶ 20. The returns as filed by Travia's may have been consistent with their source documents (the altered Z tapes), but that neither made them accurate nor reliable, because the Z tapes were manually altered and could not be corroborated. *Crabtree v. Comm'r of Internal Revenue*, 78 T.C.M. (CCH) 1232 (1999) (discussing a bar business where income "is mostly cash and income is easily hidden from normal view," if books and records are not adequate, the taxing authority may use its own reasonable method of reconstruction and need not accept taxpayer records simply "because its records were consistent with the information reported on its tax returns"). The hearing officer found that "Mr. Mellion's explanations of his handwritten alternation of the records were deficient." She found that discrepancies ranged "from less than 1 percent to more than 500 percent on various days." Taxpayers offer contradictory and inconsistent testimony concerning their operational and bookkeeping practices.

¶ 21. ▪ When a taxpayer's records are not maintained so as to allow the determination of the correct tax liability, as was the case here, then the Commissioner must conduct an examination beyond the books and records. To hold otherwise would eviscerate the ability to make any meaningful or accurate assessment and render the language of both 32 V.S.A. § 9243 and § 9273 ineffective or meaningless, a result we avoid. *Chittenden v. Waterbury Ctr. Cmty. Church, Inc.*, 168 Vt. 478, 491, 726 A.2d 20, 29 (1998). And, when a taxpayer's records are incomplete or faulty, the taxing authority necessarily must estimate liability. The failure of the taxpayers to provide records sufficient to verify their tax as reported effectively forced the Department's auditor to go outside Travia's questionable records to estimate the amount of tax due.

¶ 22. Taxpayers here have not met their burden of demonstrating the assessments are incorrect, and we uphold the Commissioner's determination.

*Affirmed.*